UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **DOCKET NO. 23-cr-10032-LTS** |
| ) | |
| **MOHAMMED CHOWDHURY** ) | |
| ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Mohammed Chowdhury has acknowledged that he committed a very serious crime in two important ways- he has pled guilty and he has entered a plea agreement with the government in which he agrees that he deserves at least an 87-month sentence. A federal prison sentence of 87 months will be a life-changing event for Mohammed Chowdhury, particularly since this will be the first period of incarceration in his entire life. Because many of the mandatory sentencing factors show that he presents a low risk of recidivism, the defense submits that the primary justification for a long period of incarceration is "just punishment." 18 U.S.C. § 3553(a)(2)(A). A sentence of seven years and three months in federal prison will certainly achieve just punishment on the particular facts of this case and for this defendant. Considering all of the mandatory sentencing factors in combination, such a sentence will achieve the goal of imposing one "that is *minimally* sufficient to achieve the broad goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (emphasis added).

I. **The nature and circumstances of the offense demonstrate Mr. Chowdhury's reluctance before committing the offense.**

Mr. Chowdhury has pled guilty to both counts of the Indictment, acknowledging that over the course of two months he eventually used a facility of commerce in the commission of murder-for-hire under 18 U.S.C. § 1958(a). He has entered into a plea agreement in which he agrees that his offense calls for a sentence of at least 87 months despite never having been to prison before. He does not argue that he was entrapped. The nature and circumstances of the offense are a mandatory sentencing factor under 18 U.S.C. § 3553(a), and Mr. Chowdhury discusses them not as an excuse or explanation, but rather to provide important context for the Court's determination of a sentence that is sufficient, but not greater than necessary.

The investigation began in November 2022 when an unidentified confidential source who was already working with the FBI contacted agents and reported that Mr. Chowdhury had paid an individual to murder the mother of his children. PSR ¶ 9; See Dkt. 1-1, Complaint Affidavit, ¶ 5 (hereafter "Complaint Affidavit"). The source further reported that the individual had taken Mr. Chowdhury's money without committing the murder. Id. The source then claimed that Mr. Chowdhury expressed a desire to contact another person to commit the murder. PSR ¶ 10; Complaint Affidavit, ¶ 6. The source then provided Mr. Chowdhury's phone number to the agents, who contacted him by text. Id. None of the alleged conversations between Mr. Chowdhury and the source were recorded, and the government has not disclosed the source's identity.

The description in the Complaint Affidavit suggests that the source was simply repeating what Mr. Chowdhury had said and that the source did not know the identity of the person who took Mr. Chowdhury's money before agents became involved. In truth, it was the source who took the money, as Mr. Chowdhury explained in a recorded meeting with undercover officers on

January 4, 2023. See PSR ¶ 18. The recording of that interaction shows both Mr. Chowdhury's surprise that the agents were unaware that the source was the one who took the money, and the agent's surprise that it was. See Exhibit A, January 4, 2023 recording, 12:03-12:39[1] (submitted separately). One agent responds, "Oh, [it] took your money?" The second agent then stated that he would get the money back from the source for Mr. Chowdhury. Id.

The revelation of the source's duplicity and manipulation of the situation for profit does not change Mr. Chowdhury's guilt. However, it does cast doubt on the source's recitation of events that occurred before any conversations were recorded, particularly as to what the money given to the source was intended for. The source left out important information in what it communicated to agents and had an interest in presenting a particular version of the beginnings of the story of how Mr. Chowdhury came to commit this offense.

Of course, once agents began interacting directly with Mr. Chowdhury they created a record of those interactions. The first communication was by text in November 2022. PSR ¶ 11. The agent texted Mr. Chowdhury, explaining he had been referred by the source. Exhibit B, Initial Texts. That first text was sent on November 22, 2022. Id. The agent texted again on November 23rd, November 24th, and December 7th. Id. Mr. Chowdhury's first response was not until December 7, 2022, after four texts from the agent and 16 days after the first one. Id. This lapse of more than two weeks does not suggest an eagerness to pursue the plan that had been reported by the source. Indeed, it suggests a reluctance to do so.

Of course Mr. Chowdhury did eventually respond of his own volition and from that point on met with agents a total of four times and spoke to them on the phone on multiple other

---

[1] Time stamps refer to the counter at the bottom left of the screen, which reflects the time within the recording and can be adjusted by using the bar at the bottom of the screen.

occasions. He acknowledges that he provided information about the identities and locations of the victims. The recordings of the meetings however, reveal that he was originally seeking to pay someone to commit assault and battery rather than murder and only eventually chose the latter after patient work by the agents. See PSR ¶ 13 ("Chowdhury informed UCE that he wanted him to rob and beat his former wife so that no one would think he was coordinating it.")

The first meeting occurred on December 13, 2022. PSR ¶ 14.[2] The recording of the conversation during that meeting clearly shows that Mr. Chowdhury intended to pay for an assault and battery, although an admittedly serious one. In response to an agent bringing up that he supposedly wanted the male victim killed, Mr. Chowdhury stated "Not killed…just you know… just do something like, like you know beat him up very well so that he cannot you know survive or he cannot leave the city or leave the country like that... he have to go back country like that." Complaint Affidavit, ¶ 14. At the close of the December 13th meeting, the agents told Mr. Chowdhury to think about what he wanted and let them know. Complaint Affidavit, ¶ 15.

The second of the four meetings occurred on December 20, 2022. See PSR ¶ 16-17. At that time an agent tried to clarify the understanding by stating, "So my understanding is that you want the boyfriend killed, correct?" Complaint Affidavit, ¶ 19. The meaning of Mr. Chowdhury's response is uncertain because he asks "So what you can do, what you can do. You can like, you know, no evidence, disappear, like that?" PSR ¶ 16. The agent then states that she understands that Mr. Chowdhury wanted it to look like a robbery, raising the question of whether at that point Mr. Chowdhury was still asking for a robbery or a murder that looked like a robbery.

---

[2] The Presentence Report describes a December 8, 2022 conversation as a "meeting" but based on discovery that conversation was a phone call in which the December 13, 2022 meeting was planned. PSR ¶ 13.

Mr. Chowdhury's reluctance is also evident during the discussion of price at the second meeting. The agents told him that it would cost $10,000 for one victim. Complaint Affidavit, ¶ 19. Mr. Chowdhury explained how he could not possibly afford that amount because he worked for $12 per hour at a convenience store. Complaint Affidavit, ¶ 20. To try to keep the ruse going, the agents agreed to cut the price in half to $5,000 for one victim, and that only $1,000 would have to be paid up front. Complaint Affidavit, ¶ 22. The agent again tried to clarify the understanding by stating, "So we understand each other," with Mr. Chowdhury responding "Yeah, we understand each other." Id. In subsequent phone conversations, the agents continued to lower the price to keep Mr. Chowdhury engaged, dropping the price for one victim to $4,000 and the deposit as low as $500. Complaint Affidavit, ¶¶ 23-25.

Any illusion that a meeting of the minds for a murder-for-hire had already been reached was quickly dispelled at the third of the four meetings, which occurred on January 4, 2023. PSR ¶ 18. While the agents repeatedly tried to make the clear that the plan was for a murder, Mr. Chowdhury repeated his intention from earlier meetings- "One thing, so I don't want to uh, actually kill him, cause I'm a Muslim honestly, [unintelligible] I want to just, you know, destroy him." Exhibit A, 16:00-16:10. When the agents repeated that they are there only for a murder, his lengthy pauses in response speak volumes. Exhibit A, 18:00-23:30. Their frustration with his repeated attempts to procure a robbery/assault when they were only offering a murder became evident when the agent told him: "We're not going to debate this shit anymore. Does that make sense?" Complaint Affidavit, ¶ 32. The third meeting concluded with an explicit understanding that there was in fact no agreement.  Exhibit A, 22:55-24:35. The agents told him that he had a week to make a decision. Complaint Affidavit, ¶ 30.

The agent's voiced their frustration at the meeting on January 4, 2023. This was the third in-person meeting over a period of six weeks. Multiple phone calls had been made in between the meetings. The agents had been clear, but Mr. Chowdhury remained clearly torn about the option he was being offered. The agents, to try and keep Mr. Chowdhury engaged, dropped the price significantly, from $10,000 to $4,000. They offered him installment payments. They dropped the down payment to $500.

Mohammed Chowdhury should have walked away. He did not, and after the January 4, 2023 meeting he consummated the deal. PSR ¶¶ 19, 20. He has now accepted responsibility for doing so.

Yet his extended hesitation to commit this crime, and the fact that he only did so after federal agents made it unrealistically possible, demonstrate that it is not necessary to sentence him to more than 87 months to teach him that his conduct was wrong or to deter him from committing any other crimes in the future. The particular circumstances under which this crime was committed show that Mr. Chowdhury was very close to *not* committing it. It is not hard to imagine how this investigation could have concluded without Mr. Chowdhury committing murder-for-hire. The agents would have been justified had they abandoned what had become a frustrating investigation by the third meeting on January 4, 2023. Mr. Chowdhury could have been, and should have been, stronger and listened to the voice inside him that was telling him not to go through with it. Mr. Chowdhury's reluctance shows that he will be able to immediately get back on the right side of the law when he is released after an 87-month sentence.

The particular facts and circumstances of this case also demonstrate that Mohammed Chowdhury was never in a position to actually make this crime a reality. To the confidential source he was a mark. The source took his money, reported him to law enforcement, and didn't mention

its profit. The agents had to show extreme patience to get Mr. Chowdhury to commit this crime. Given that the only people he spoke to about harming the victims were a confidential source who confidently took his money and federal agents, it is clear that he had no connections to anyone who would carry out any actual violence. He naively believed that a $500 deposit, with the balance to be paid slowly over time, would be sufficient to induce someone to commit serious harm on his behalf. It appears that Mohammed Chowdhury could only have committed murder-for-hire under these particular circumstances. Because he was not in a position to make the crime a reality, an 87-month sentence is sufficient.

## II. **Although the technically correct advisory range calls for a much longer sentence, a principled application of the guidelines supports a sentence of 87 months.**

Mr. Chowdhury does not dispute that the advisory guideline sentencing range is 188-235 months. PSR ¶ 70. However, that advisory range results from a strange cross-reference that would appear to prevent the application of the murder-for-hire guideline in any murder-for-hire case. The guideline explicitly indexed to murder-for-hire under 18 U.S.C. § 1958 is § 2E1.4. That guideline calls for a base offense level of 32. Because there were two intended victims in this case, a two-level increase would apply under the multiple count adjustments of § 3D1.4, resulting in an Offense Level of 34. PSR ¶ 36. Then three points would be subtracted for acceptance of responsibility, resulting in a total offense level of 31. Mr. Chowdhury has just one criminal history point, which places him in Criminal History Category I, where the advisory range at Offense Level 31 is 108 to 135 months. This straightforward application of the apparently clear guideline under USSG ¶ 2E1.4 informed the parties' plea agreement, in which

the government recommends the low end of 108 months and the defense agreed to a floor approximately 20% below the low end at 87 months.

Yet the straightforward application is not the technically correct one. Section 2E1.4(a)(2) also includes a cross-reference to "the underlying unlawful conduct" if it results in a higher offense level. Of course, the underlying unlawful conduct for murder-for-hire is conspiracy to commit murder, which is governed by USSG § 2A1.5. That guideline results in a total offense level of 36, where the advisory range at Criminal History Category I is 188-235. PSR ¶¶ 27-41, 70. This system seems to result in a situation where the indexed murder-for-hire guideline will never actually apply in a murder-fire hire case. Indeed, were it not for the fact that two victims are present in this case, the technically correct offense level would have been 34, where the advisory range in Category I is 151-188, above the statutory maximum of 120 months for each count of 18 U.S.C. § 1958. The First Circuit has called the cross-reference to Conspiracy to Commit Murder "curious" because it will apply "virtually every time a defendant is charged with the use of interstate commerce facilities in the commission of murder-for-hire" and recommend a sentence above the statutory maximum. *United States v. Vasco*, 564 F.3d 12, 23 & fn.8 (1st Cir. 2009).

It appears that judges across the country recognize this curiosity and reject the reference to the much higher offense level from the conspiracy to commit murder guideline at § 2A1.5. The JSIN data included within the Presentence Report provides information about all cases within the last five years in which the guideline was § 2A1.5, the Offense Level was 36 and the Criminal History Category I. PSR ¶ 85. There were only three such cases after excluding defendants who received a substantial assistance departure. Id. The average sentence for the three cases was 94 months and the median sentence was 96 months, approximately half of the

low end of the advisory range of 188-235 months. The average and median sentences are closer to the defense's recommendation of 87 months than to the government's recommendation of 108 months. The defense suggests that adopting the government's recommendation would violate the statutory requirement to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). In light of the particular facts of Mr. Chowdhury's case, including the nature and circumstances of the offense as discussed above, and the history and characteristics of the defendant as discussed below, the defense's recommendation of 87 months is justified, particularly because it is only seven months below the average sentence in similar cases.

Sentences in other murder-for-hire cases in this District also support the defense's recommendation of 87 months. Defendant Joseph Burke received a 90-month sentence despite his extensive criminal history, including prior federal convictions. *United States v. Joseph Burke*, 15-CR-10319-DJC. Mr. Chowdhury recommends a sentence only three months shorter despite his minimal criminal history. Defendant Jose Carmona received a 70-month sentence despite being designated a career offender which brought the advisory range to the statutory maximum 120 months. *United States v. Jose Carmona*, 12-cr-30047-MGM, Dkt. 103. Defendant Cody Herr received a 72-month sentence despite also having an advisory range at the statutory maximum of 120 months. *United States v. Cody Herr*, 16-cr-10038-IT, Dkt. 102. These cases demonstrate that even before JSIN data was available, judges in this District were willing to sentence well below the curious and excessive advisory range in appropriate cases. Each of these comparison cases supports the defendant's argument for an 87-month sentence. When considering these cases, the much longer sentence of 108 months recommended by the government would result in unwarranted sentence disparity.

### III. Mr. Chowdhury's history and characteristics show that he presents a low risk of recidivism, reducing the need for a sentence longer than 87 months.

As discussed above, Mr. Chowdhury's offenses were committed under particular circumstances which will not be repeated again. Moreover, his history and characteristics show that he presents an extremely low risk of committing any type of crime in the future.

Mohammed Chowdhury was born in Bangladesh. PSR ¶ 52. He attended school there, graduating high school, college, and earning a master's degree in economics, finance, and accounting. PSR ¶ 64. He came to the United States in 2003 and later became a United States citizen. PSR ¶ 53.

Prior to coming to the United States Mr. Chowdhury taught math in Bangladesh. PSR ¶ 65. Despite his advanced education in his native country, when he came to the United States he was forced to take positions at CVS and Tedeschi's. Id. He later worked as a taxi driver for 10 years. Id. Apart from a lapse during the COVID-19 pandemic, Mr. Chowdhury has been fully employed for his entire adult life. Id.

In 2007 Mr. Chowdhury married his ex-wife through an arranged marriage. PSR ¶ 56. They separated in 2018 and divorced in 2021. Id. The dissolution of his marriage and loss of his family form the context in which he came to commit the offenses in this case.

The dissolution of Mr. Chowdhury's marriage, and his response to it, has had serious consequences for him. Prior to the break-up he was a social drinker, but during and afterwards he came to drink every day, including at the time of his arrest. PSR ¶ 63. The period of the break-up was also the first time in his life that experienced symptoms of depression and anxiety. PSR ¶ 62. While in Bangladesh he was prescribed medication to treat his symptoms. Id. He notes that his mental health has improved during his incarceration, PSR ¶ 62, likely a result of stopping drinking.

With his marriage ending, the loss of the ability to see his children, experiencing anxiety and depression for the first time in his life, and drinking daily, Mohammed Chowdhury reacted terribly. He was twice charged with assault and battery against his wife, PSR ¶¶ 49-50, with both cases being dismissed. He received a continuance without a finding for violation of a restraining order, which accounts for his only criminal history point. PSR ¶ 44.

Clearly Mohammed Chowdhury responded terribly to the adversity in his life. He has lost his family, and now he has lost his freedom for at least the 87 months being recommended by the defense.

Now that he has experienced those severe consequences, he presents no risk of recidivism in the future. His age, education, employment history and minimal criminal history are all well-associated with a low risk of recidivism. He is 47 years old, and with an 87-month sentence he will be in his mid-50s at the time of his release, even with good time reductions. Removed from the crisis which led to his offenses, and having been punished, there is no reason to think he will ever violate the law again. An 87-month sentence will thus protect the public as required under 18 U.S.C. ¶ 3553(a)(2)(C).

The letters of support submitted on Mr. Chowdhury's behalf show that he has been, and will be, a positive member of his community. Exhibit C, Letters of Support.[3] Members of his community have described him as a hard-worker and helpful to others. Id. His good friend Mohammed Monsur spoke to the presentence report writer, describing him as a good employee and helpful coworker. PSR ¶ 55. Mr. Monsur has tried to support Mr. Chowdhury because he now has no family in the United States. Syed Nuruzzaman, another friend of Mr. Chowdhury's, also

---

[3] The letters were previously submitted as part of Mr. Chowdhury's arguments for release during detention proceedings in this case. Counsel attempted but was unable to reach the writers to obtain updated versions.

has offered to help him reintegrate into society after he is released. Exhibit C, Letter of Syed Nuruzzaman.

## CONCLUSION

Mohammed Chowdhury committed two very serious offenses in this case that call for a serious punishment. The offenses were committed under particular circumstances which will not be repeated. This will be the first incarceration in his life. His history and characteristics show that he will be able to reintegrate fully into society upon his release. The defense recommendation is in line with the average sentences for similar cases as shown by data from the Sentencing Commission. For all these reasons, a sentence of 87 months is one that is sufficient, but not greater than necessary to accomplish the purposes of sentencing.

        Respectfully Submitted,
        MOHAMMED CHOWDHURY
        By his attorney,

        */s/ Joshua Hanye*
        Joshua Hanye, BBO #661686
        Federal Public Defender Office
        51 Sleeper Street, 5th Floor
        Boston, MA  02210
        (617) 223-8061

## CERTIFICATE OF SERVICE

I, Joshua Hanye, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on April 22, 2024.

        */s/ Joshua Hanye*
        Joshua Hanye